The opinion of the Court was read by Putnam J. at the April term 1823,- as drawn up by
Parker C. J.
The questions in this case grow out of the facts reported by the judge, and the records referred to in his report ; from which sources it appears, that the present town of Milford, with some little variation, which we think immaterial, before the year 1780, when it was incorporated as a town, existed as a precinct, called The Easterly Precinct in the Town of Mention, of which town it was a part, having been incorporated as a precinct in the year 1741. In the year 1743, the meetinghouse, which is the subject of this action, was built by the inhabitants of said precinct, on a piece of ground within the same, which was afterwards granted to said inhabitants by the person having title thereto. Finding, by an examination of our statutes, that a precinct and parish differ in nothing but name, both of them being corporations entitled and required to support public worship, and having all the powers and privileges necessary for that purpose, the terms may be used indiscriminately in the course of this opinion. Soon after the precinct was incorporated, the Rev. Amariah Frost was settled and ordained over it, and he continued its pastor until after the incorporation of the precinct into a .town. After this incorporation, in 1780, which was on a petition from the inhabitants of the precinct, all the parochial affairs of the same were transacted in town meetings, no parish or precinct meeting having been held. The money necessary for the minister’s salary and for repairing the meetinghouse was raised by a vote of the town, and assessed and collected by town officers, and paid into the town treasury ; except in some years, when the minister was paid by contribution. And, after the death of Mr. Frost, in 1792, the pulpit was supplied by the town until 1801, when the Rev. David Long was settled and ordained there. His settlement and salary were also raised by a vote of the town, and the care of the meetinghouse was from time to time committed to a person chosen by the inhabitants of the town. The town also, in this interval, sold a part of the ground floor for the purpose of making pews, and in the year 1791, by vote, authorized Oliver Daniel and others to saw the house asunder, for the purpose of enlarging it, and making an additional number of pews. The house was also used by the *98 town for public purposes on election days, &c., and it was call-e(i the town’s meetinghouse.
From all these facts, the plaintiffs contend, that the property in the land and building, originally in the precinct, came to the town, and that, by force of the incorporation of the town, tie precinct became extinct, or if it did not, that-the various acts of ownership above stated gave such an exclusive possession to the town, that they have a right to maintain this action of trespass.
The defendants resist the action on the ground that the. property was not in the town, but in the Congregational parish, which was organized under a warrant from a justice of the peace in 1815, they being authorized by said parish to do the act complained of as a trespass ; and also because, as they allege, the possession of the house was in the said parish at the time the supposed trespass was committed.
As it appears from the report, that the persons claiming to be the Congregational parish had the sole occupation and control of the house for the purposes for which it was erected, and that the key of the same was in the custody of their servant from the year 1815 to the time when the action was commenced, it is clear that the town had not such an exclusive possession as will maintain the action on that ground only, though, if the property is in the town, the continued use of the house for municipal concerns might be a sufficient possession for that purpose. It is necessary, therefore, to go into the question of property, in order to determine the controversy between the parties.
And first, we are satisfied that the mere incorporation of the precinct into a town did not of itself merge or extinguish the precinct. " The two corporations are distinct in their nature, their object and their powers. A precinct or parish is a corporation established solely for the purpose of maintaining public worship, and its powers are limited to that object. It may raise money for building and keeping in repair its meeetinghouse, and supporting its minister, but for no other purpose. A town is a civil and political corporation established for municipal purposes. They may both subsist togethei in the same territory, and be composed of the same persons. *99 Originally, most of our towns partook of both characters, for, as the laws required of towns, as well as of precincts and parishes, the support of public worship, under a penalty, so power was given to them to raise money to comply with this requisition ; and until a parish was erected within a town, it has been usual to manage all parochial affairs in town meetings and by town officers. But upon the establishment of a parish within a town, it became necessary that the residue should also assume the qualities of a parish, and therefore, as early as 1718, (St. 1 Geo. 1, c. 1,) it was provided, that whenever a parish was created within a town, that part of the town which had not undergone the change should ipso facto become a parish, and be the first or principal parish. This statute was revised and reenacted in the year 1786. (St. 1786, c. 10, § 5.) This shows that towns, originally, were both of a municipal and parochial character ; and it has been held, that, on this account, towns might, even before the establishment of a parish within their boundaries, separate these characters, and have distinct meetings of town and parish in relation to the subjects which appertain to each.
From this it will follow, that if a parish should be incorporated into a town, it does not necessarily lose its parochial corporate character, but may still proceed to hold parish meetings, elect parish officers, and keep records distinct from those of the town. These principles were discussed and settled in the case of Dillingham, v. Snow, 3 Mass. Rep. 276, and after-wards revised and confirmed in a case between the same parties in 5 Mass. Rep. 547. In those cases it appeared, that the North parish in Harwich was incorporated into a town, by the name of Brewster, and having continued to act as a parish, it was contended, that it ceased to exist in that capacity upon its incorporation into a town ; but it was decided that the parish still continued to exist. It was also settled as law, that the inhabitants of a town are not necessarily, and of course, members of a parish included within it; but that those who are exempted on account of their religious scruples and opinions, though members of the town, are not members of the parish comprehended oy the same boundaries.
The principles adopted in those two cases, which were very *100 maturely considered and revised, have a strong bearing on this case. The precinct existed as a corporation established by law from the year 17.41 to the year 1780. At that time, it became convenient that the inhabitants of the same territory should be invested with municipal powers and privileges, and, upon their application, an act of the General Court was passed for that purpose. They did not surrender their former corporate powers, nor were they forfeited. They might, therefore, had they seen fit, have continued to act separately as a parish, and as such have managed their property and parochial concerns. It is true, that by a long continued non-user of their parochial powers, they might have forfeited them ; so that the next point to be considered is, whether they have practically surrendered their charter to the town in such manner as that it could not afterwards be resumed.
The various acts of the town respecting parochial affairs, such as the raising money for the minister’s salary for a number of years, and the care and disposal of the meetinghouse, would be strong evidence in support of this point, if they stood wholly unexplained by circumstances tending to show a continued existence of the parish, and an exercise of powers necessary to keep it alive through the instrumentality of the town. If, by mutual consent of town and parish, the former became the agent for the benefit and use of the latter, and this was so considered all along by both parties, then nothing can be inferred from these acts but a suspension of the powers of the parish, while it was convenient for both corporations that the parochial business should be so conducted.
It is provided by the statutes of 1 Jlnne, c. 3, and 4 Geo.'I, c. 1, that whenever the assessors of a precinct shall neglect their duty, the selectmen of the town shall supply their place , so, also, by St. 1787, c. 10, if there is no committee of a parish, application may be made to a justice of the peace to call a meeting for the purpose of enabling them to transact their business. These statutes are grounded upon the supposition that these corporations may sometimes neglect their necessary organization, and are intended to keep them alive notwithstanding such neglect.
Now the records and votes of the town show, that although *101 the affairs of the parish were conducted in the form of town meetings, yet that the town acted in these matters rather as the agent of the parish, than on its own account. While the inhabitants all remained of the same religious denomination, and attended public worship in the same place, there was no occasion of separating parochial from municipal busi ness. All were liable to the same duties, and contributed in equal proportion to the expense. But as soon as some of'the inhabitants were of a different persuasion, and worshipped elsewhere, it was deemed unjust to exact any contribution of them towards the support of the Congregational form of worship. The existence of a religious society distinct from the town was then recognized, and all their proceedings had reference to such society. This society was the old parish or precinct, which was originally of the Congregational order, existing without any officers, but capable of being reorganized whenever exigencies should require.
Thus in 1792 it was voted “ not to tax any only as usual to the Rev. Amariah Frost, except such as shall be voluntary to pay.” This implies'that exemptions had existed before. So, in 1795, “ voted to exempt from a ministerial tax all those persons in said town who are of a different persuasion from the Congregationalist, and do not attend public worship with them.” In 1~99, a similar vote was passed. In 1801, when Mr. Long was about to be settled, a vote was passed “ to exempt all denominations who do not belong to the Congregational society, in taxation either for the cost of settlement, or salary, for Mr. David Long, should they settle him in said town ; ” and in the same year a more specific vote of the same purport was passed, designating Josiah Ball, Obadiah Wood, Noah Wiswall and thirty-five others, and extending the exemption to all Quakers, and all other persons who are known to be of a different denomination from the Congregationalists in religion, who had before been exempted. Many other votes of the like character were passed; and in 1813, the town being uneasy that the taxes for the Congregational society should be assessed and collected at their expense, an article was inserted in the warrant for calling a town meeting, to see whether the town would *102 agree, that those who attended on Mr. Long, and paid him for preaching, should be allowed to grant, assess and collect their own taxes ; and the subject was passed over only on the stipulation of two of Mr. Long’s parish, that it should cost the other societies nothing. At this time two other societies existed in the town, making probably a majority of the inhabitants. These had withdrawn from the old society, and had each erected a meetinghouse for themselves ; and it became necessary for those who remained to adopt some measures to enable them to carry on their parochial affairs in a different manner. They therefore, in 1815, under a warrant from a justice of the peace, pursuant to St. 1786, c. 10, § 2, met as the Congregational parish, and elected parish officers, and they have ever since conducted their parochial affairs in that form.
We think they had authority to do this. They are the successors of those who constituted the precinct; they had preserved the same form of worship with their predecessors, had constantly occupied the same meetinghouse, and had never ceased to perform the duties required of that corporation. A majority of the inhabitants had gone away from ■them, but had left them in the enjoyment of all their property and rights. All who live within the bounds of the precinct have a right still, by reuniting themselves with the parish, to enjoy the use of the meetinghouse as heretofore; but those who remain and are bound by the contract with their minister, have succeeded as corporators to the property in the land and in the house. There seems to be no difference in principle between this case and the case of Jewett v. Burroughs, 15 Mass. Rep. 464. In that case, a majority of the town had gone off and left a remnant behind, which remnant organized themselves as a Congregational parish, and settled a minister over themselves, who recovered the ministerial land originally given to the town. It is but just that it should be so; for societies incur burdens and duties which are not much diminished by the diminution of their numbers, and the expense is greatly increased to the individuals. We consider all the acts of the town in relation to the meetinghouse as done in their parochial capacity, and therefore giving them *103 no right in their municipal character.[1] The parish never lost possession of the meetinghouse, never forfeited the property ; and the town, as such, never acquired any.
The use of the house for public municipal purposes could give no right of property, nor was it any thing like an exclusive possession, while the society had the use of it every Sabbath for the purposes for which it was built.
We are, therefore, after maturely considering the case, all of opinion, that the verdict should be set aside, and that the plaintiff should become nonsuit.[2]

 See Woodbury v. Inhabitants of Hamilton, 6 Pick. 10. Where -and is - granted to a town for the use of the ministry, the grant is to be taken to refer to the town in its parochial and not in its municipal capacity. Richardson v. Brown, 6 Greenl. 355. A count on a cause of action accruing to a town in its parochial capacity may be joined with a count on a cause of action accruing in its municipal capacity. Inhabitants of Alna v. Plummer, 3 Greenl. 88. See Cochran v. Camden, 15 Mass. R. 302.

 See Winthrop v. Winthrop, 1 Greenl. 208; Parsonsfield v. Dalton, 5 Greenl. 217. A meetinghouse, built by a town before it is divided into parishes, becomes, upon such division, the exclusive property of the first parish; and the use of it, for many years before the division, for town meetings for municipal purposes, gives the town no easement in it. First Parish in Medford v. Pratt, 4 Pick. 222. Where the parochial affairs of a town have been managed by the town, without any organization as a parish, and a new parish is formed in the town, the affairs of the old parish may still lawfully be managed as before. Inhabitants of Ashby v. Wellington, 8 Pick. 524. See. Inhabitants of Bina v. Plummer, 3 Greenl. 91.